*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 10, 2025
11:01 AM

Plaintiff-Appellee,

v

No. 368164
Ingham Circuit Court
LC No. 20-308-FC

FURQUAN MICHAEL-DESHAWN KNOX,

Defendant-Appellant.

Before: YATES, P.J., and BOONSTRA and YOUNG, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of five counts of criminal sexual conduct in the first degree (CSC-I), MCL 750.520b(1)(a), MCL 750.520b(2)(c), and four counts of criminal sexual conduct in the second degree (CSC-II), MCL 750,520c(1)(a), MCL 750.520c(2)(c).[1] The trial court sentenced defendant to prison terms of 25 to 50 years for each CSC-I conviction, and 75 months to 15 years for each CSC-II conviction. The trial court found that three of defendant's CSC-I convictions, and one of defendant's CSC-II convictions, arose out of the same transaction, and ordered them to be served consecutively to each other; the remaining sentences are concurrent to each other and to the first CSC-I conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of defendant's sexual abuse of his two nieces, TK and LM. Defendant is the brother of Haja Knox. Haja Knox is married to Tycheke Myers. LM is Myers's biological child, and TK is Haja's biological child.[2] LM and TK spent periods of time in both Michigan and Georgia, including attending school in both states. During the relevant periods of time in this case, defendant lived with his mother, Donna Haymon, in Michigan.

---

[1] Defendant was acquitted of one additional count of CSC-I.

[2] Both Knox and Myers are women.

In 2020, LM, then fourteen years old, disclosed to Myers that defendant had sexually abused both her and TK years earlier. TK confirmed this allegation when Myers asked her about it. LM testified at trial regarding an incident that had occurred at Haymon's house sometime between 2013 and 2015. The girls' mothers would sometimes leave the girls at Haymon's house so that she could watch them; Haymon, in turn, would sometimes leave them in the care of defendant. LM testified that, while watching television with defendant and TK in defendant's bedroom, defendant sexually abused them in various ways, including forcing both girls to perform oral sex on him, and attempting to penetrate TK's vagina and anus with his penis (but stopping when TK said that it hurt). LM testified that defendant later touched her breasts, vagina, and buttocks while she was in the bathroom.

TK testified to several incidents when defendant sexually abused her individually, generally when she slept over at Haymon's house. TK testified that Haymon's house had a guest bedroom, but that there was no bed in it and TK found it scary. TK would sleep in Haymon's bed unless Haymon did not want her to do so on a particular night; in that case, she would sleep in defendant's bed. TK testified that defendant rubbed his penis on her buttocks, and that this happened when she was six or seven. Defendant told TK not to say anything or they would both go to jail. TK testified to another incident when defendant pulled her pants down and rubbed his penis between her thighs and vaginal lips until he ejaculated; TK testified that she was eleven at this time. Defendant again told her not to tell anyone or she would go to jail because she "let him do it." TK testified to another incident when defendant forced her to stroke his penis with her hand. TK testified that she did not remember specifics, but that there were several times when defendant would touch her vagina or rub against her. TK testified to the incident when LM was present; she testified that defendant's penis penetrated her vagina and anus slightly before he stopped because it wouldn't fit. TK testified that when she was thirteen, defendant grabbed her arm and attempted to force her to touch his penis, but she resisted, causing a physical altercation that ended when TK got a knife from the kitchen and threatened to kill defendant if he ever did anything to her again. TK made up a story to tell her parents; she told them that defendant said something she didn't like and she chased him out of the house.

During cross-examination, defense counsel asked TK if any "incidents" had occurred between her and defendant in Georgia, prior to the incidents that she had disclosed in Michigan. TK testified that there was "one little small incident that I remember very little." Defense counsel pointed out that TK had not mentioned the Georgia incident during her forensic interview. On redirect, TK testified that the Georgia incident had involved defendant making her smoke a cigarette; later, he told her to sit on his lap and "proceed[ed] to hump basically using his penis area and my butt area." TK estimated that she was "very young" when this happened, younger than the age a child starts school.

When the trial court released TK from her subpoena, it cautioned her not to discuss her testimony during trial, and added: "If you are in therapy, you certainly can talk about whatever you want with your therapist, but as to any of the testimony, please refrain from that." When the trial court released LM from her subpoena, it gave her a similar caution, stating: "And if you're in therapy, I don't know, but you certainly can talk about what you said or what you hear with your therapist but just not with any witness."

During Myers's direct examination, the prosecution asked her, "What has this whole experience been like for your family?" Myers responded at length, detailing the self-harm and other behaviors exhibited by LM and TK over the past several years. During her lengthy statement, she said, "I deal with [TK] falling down the stairs trying to get to [LM] because she thought the one door in the basement somebody could get into, because he's cut his tether off and they think he's on the way to get them."

Haja testified that defendant (her brother) could cook for himself, use a phone, spell, count, and bathe himself. She testified that he had had a few relationships with adult women. She believed he was not disabled. Haja believed TK was four years old when the incident in Georgia occurred; she said Haymon had told her TK was lying at the time.

Defendant's brother, Carl Knox, testified that he overheard a conversation between Haymon and defendant in which Haymon "coached" defendant on what to say. He testified that defendant said something like "they hot little girls and, you know, they act like they had wanted it or had it coming or whatever."

Barbara Welke testified as an expert witness for the prosecution. The trial court qualified her, without objection, as an expert in the areas of child sexual abuse and the dynamics surrounding disclosure of that abuse. Welke testified that she had not met or spoken with LM and TK or any witnesses in the case, or reviewed any documentation. Welke testified generally about the behavior of children who have been sexually abused, particular surrounding disclosure of that abuse.

After the close of the prosecution's proofs, outside the presence of the jury, the parties discussed the defense's first witness, Haymon. The prosecution informed the trial court that Haymon had violated the court's sequestration order by speaking to Carl on the phone and by speaking to defendant on recorded jail phone calls. The prosecution stated that it would be exploring this topic on cross-examination. The trial court confirmed with Haymon that she understood that her testimony could result in her being held in contempt.

Defense counsel opted to have Haymon testify. Haymon testified about various homes the family had resided in over the years in both Georgia and Michigan, and when they had moved in and out of those homes. Haymon also testified that defendant had been hit by a car when he was five years old, sustaining a closed head injury. She testified that defendant received special education services in school and ultimately quit school when he was sixteen and in the seventh grade. Haymon admitted that defendant could bathe and cook simple dishes, but was skeptical of his ability to live on his own. She testified that he was "limited" after his injury, and had impulsive behavior and a lack of empathy. Haymon admitted to speaking to defendant on recorded jail calls. The recording of one of those calls was played for the jury.

The jury convicted defendant as described. The trial court sentenced defendant as described. The three CSC-I sentences and the CSC-II sentence that were imposed consecutively related to defendant's sexual abuse of LM and TK on the same day and substantially in the same room.

After sentencing, defendant moved the trial court for a new trial or a *Ginther*[3] hearing regarding his trial counsel's alleged ineffectiveness, as well as for resentencing. The trial court denied defendant's motion.

This appeal followed. After filing his claim of appeal, defendant moved this Court to remand for a *Ginther* hearing regarding his counsel's alleged ineffectiveness, which this Court denied "without prejudice to a case call panel of this Court determining that remand is necessary" on plenary review.[4]

## II. JUDICIAL MISCONDUCT

Defendant argues that the trial court pierced the veil of impartiality by telling the complainants in front of the jury that they could discuss their testimony with therapists. We disagree. We generally review de novo, as a question of constitutional law, whether judicial misconduct occurred and denied a defendant a fair trial. *People v Stevens*, 498 Mich 162, 168; 869 NW 233 (2015). However, because defendant did not raise this issue before the trial court during trial, this issue is unpreserved and reviewed for plain error affecting substantial rights. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011).

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *Jackson*, 292 Mich App at 597 (quotation marks and citation omitted). "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 171. A reviewing court should evaluate the totality of the circumstances surrounding the alleged misconduct, and should consider several factors, including, but not limited to:

> [1] the nature of the trial judge's conduct, [2] the tone and demeanor of the judge, [3] the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, [4] the extent to which the judge's conduct was directed at one side more than the other, and [5] the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id.* at 164 (citation omitted).]

A single instance of misconduct may, in some instances, "be so egregious that it pierces the veil of impartiality." *Id.* at 171.

In this case, after LM and TK testified, the trial judge gave each of them the standard warning not to discuss their testimony with anyone else, but added that *if* the witness had a therapist, she could discuss her testimony with that therapist. The trial judge made it clear that she did not know whether LM or TK was seeing a therapist, nor did the judge make any further

---

[3] *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

[4] *People v Knox*, unpublished order of the Court of Appeals, entered March 24, 2025 (Docket No. 368164).

commentary on the matter. However, the trial judge did not tell other witnesses that they could discuss their testimony with a therapist.

Applying the *Stevens* factors, we conclude that the veil of impartiality was not pierced. Regarding the nature of the alleged misconduct, defendant argues that the trial judge's comments were "biased commentary" in the presence of the jury. *Stevens*, 498 Mich at 244. Specifically, defendant argues that the trial judge's statements "communicated to the jury that the complainants were different and they were different because they were victims, i.e., they were assaulted by [defendant]." We disagree. The trial judge's comments were brief and matter-of-fact, and made it clear that the trial judge had no personal knowledge of whether the girls were in therapy. While a better practice may have been to inform every witness that they were free to discuss their testimony with persons bound by confidentiality, we do not find that the trial judge's brief statements created an appearance that she believed the girl's testimony or believed defendant to be guilty. *Stevens*, 498 Mich at 171. Regarding the trial judge's tone and demeanor, and although this Court has only the transcript to review, it appears, as stated, that the trial judge's statements were brief and matter-of-fact. *Id.* Regarding the third and fourth factors, the alleged judicial misconduct occurred just twice in a six-day trial, but it did reflect an "imbalance" in the "manner of conduct" by virtue of the fact that the trial judge did not instruct other witnesses the same way. *Id.* at 177. And regarding the fifth factor, the jury was properly instructed at the end of trial that it should not infer from the judge's comments or questions that the judge had formed an opinion regarding defendant's guilt. See *id.*

Considering the totality of the circumstances, we find no error requiring reversal (plain or otherwise) in the trial judge's statements to LM and TK. Defendant's citation to this Court's decision in *People v Hudson*, unpublished opinion per curiam of the Court of Appeals, issued March 14, 2024 (Docket No. 364772), is unpersuasive.[5] In *Hudson*, the trial judge directly addressed the jury at length after the victim's testimony, offering the jurors mental health resources and counseling services as a result of the "tough testimony" they had heard. *Id.*, unpub op at 1. The trial judge also stated that "these cases—are challenging for me and everyone else in the courtroom[.]" *Id.* This Court found that the trial court had "pierced the veil of judicial impartiality by indicating that it was disturbed by the victim's testimony, thus creating the appearance of sympathy for, or partiality toward, the victim." *Id.* at 5. The trial court made no such indication in this case; rather, it merely correctly instructed LM and TK that they could discuss their testimony with a therapist, if either was seeing one. While it is true that other witnesses were not given this additional instruction, we conclude, on the whole, that defendant has not overcome the presumption of judicial impartiality. *Jackson*, 292 Mich App at 597.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that his counsel was ineffective in several respects: (1) by failing to object to the trial court's instructions to LM and TK at the close of their testimony and failing to seek a mistrial, (2) by eliciting testimony from TK that defendant had assaulted her in Georgia, (3)

---

[5] This Court is not bound by its prior unpublished opinions, although they may be persuasive. See MCR 7.215(C)(1); see also *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

by failing to request a *Daubert*[6] hearing and challenge Welke's expert testimony, and (4) by failing to object to testimony informing the jury that defendant was incarcerated during the proceedings below. We disagree.

The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. See *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). When the trial court did not hold an evidentiary hearing on the issue, there are no factual findings to which this Court, in applying a clear error standard, must defer. *People v Gioglio* (*On Remand*), 296 Mich App 12, 20; 815 NW2d 589 (2012), vacated not in relevant part, lv den in remaining part, 493 Mich 864 (2012), cert den sub nom *Gioglio v Michigan*, 568 US 1217 (2013). In such cases, this Court will determine whether the defendant received ineffective assistance on the record alone. *Id.* This Court reviews de novo whether a particular act or omission by counsel fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant. *Id.* at 19-20.

To establish a right to a new trial premised on the ineffective assistance of counsel, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51. In evaluating whether defense counsel's conduct fell below an objective standard of reasonableness, this Court begins with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and could be considered trial strategy. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012); *Gioglio* (*On Remand*), 296 Mich App at 22-23. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. See *Strickland v Washington,* 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

To establish prejudice, a defendant must show that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceedings against him would have been different. See *Trakhtenberg*, 493 Mich at 51.

## A. TRIAL COURT'S STATEMENTS TO LM AND TK

Defendant argues that his counsel was ineffective for failing to object to the trial court's statements discussed in section II of this opinion. As stated, we find no error requiring reversal in the trial court's statements; accordingly, any objection by defense counsel would have been futile, and a motion for a mistrial would have been unsuccessful. Counsel is not required to make futile objections or advance a meritless position in order to provide effective assistance. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

---

[6] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 589; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

## B. OTHER-ACTS TESTIMONY

Defendant also argues that his trial counsel erred by eliciting testimony from TK that defendant had assaulted her in Georgia. We disagree. During defense counsel's cross-examination of TK, defense counsel elicited testimony from TK that defendant had assaulted her in Georgia, despite TK having stated at her preliminary examination that all of the assaults occurred in Michigan. On redirect, TK testified regarding the details of that incident, specifically that defendant had forced her to inhale a lit cigarette and had "humped" underneath her while she was sitting on defendant's lap. TK testified that she told her grandmother, who told TK that she was mistaken about defendant's intentions and that defendant "was basically moving."

Defense counsel's elicitation of this testimony from TK could have been based in sound trial strategy. See *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Defense counsel's efforts to point out inconsistencies in TK's and LM's statements in order to cast doubt on their credibility was a valid strategy in a case that hinged on their testimony. Even though defense counsel "opened the door" for the prosecution to provide more details about defendant's prior uncharged conduct, defense counsel could have concluded that the risk was worth the reward. We will not assess this strategy with the benefit of hindsight, *Payne*, 285 Mich App at 190, or declare counsel ineffective merely because the strategy did not work, *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

Additionally, defendant cannot demonstrate prejudice. If the jury found TK's testimony concerning the assault in Georgia credible, then it stands to reason that it found TK's testimony concerning the other assaults in Michigan credible as well. The jury was properly instructed concerning the elements of each charged offense and what it needed to find in order to find defendant guilty, including being instructed that it was to find that the charged acts occurred in Ingham County in Michigan. Defendant has not demonstrated a reasonable probability that the introduction of this evidence altered the outcome of the proceedings against him. *Trakhtenberg*, 493 Mich at 51.

## C. WELKE'S TESTIMONY

Defendant also argues that defense counsel was ineffective for failing to request a *Daubert* hearing and challenge the scientific validity of Welke's expert testimony. We disagree. This Court reviews for an abuse of discretion a trial court's decision to admit evidence. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). We review de novo preliminary questions of law, such as the interpretation of statutes or the rules of evidence. *Id.*

MRE 702 governs the admissibility of expert testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 incorporates the standards of reliability established by the United States Supreme Court in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). See *Gilbert v Daimler Chrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004). Accordingly, a *Daubert* hearing tests whether the reasoning or methodology underlying the proposed expert testimony is scientifically valid and whether the methodology can be applied to the facts at issue. See *Daubert*, 509 US at 592-593. A trial court may admit expert testimony only once it is satisfied that the testimony meets MRE 702's standards of relevance and reliability. *Gilbert*, 470 Mich at 782; *Bynum*, 496 Mich at 624. In other words, an expert's opinion "must be shown to be reliable, including the data underlying the expert's theories and the methodology by which the expert draws conclusions." *People v Muniz*, 343 Mich 437, 444; 997 NW2d 325 (2022).

Defendant argues that Welke's testimony was not sufficiently reliable under *Daubert* because it was based on her experience treating victims of sexual assault, rather than on academic studies. We disagree. "Michigan courts regularly admit expert testimony concerning typical and relevant symptoms of abuse, such as delayed reporting and secrecy." *Muniz*, 343 Mich App at 443. Although it is insufficient to "simply point to an expert's experience and background to argue that the expert's opinion is reliable," *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010), in this case Welke testified that her opinion was based on more than her personal experience as a counselor. She testified that she had approximately 700 hours of additional training and education in child sexual abuse and forensic interviewing, apart from her academic study that earned her bachelor's and master's degrees. She also testified that she kept abreast of relevant research, best practices and techniques in the field of forensic interviewing, and participated in a quarterly research review with other forensic interviewers.[7] Defendant has failed to establish that Welke's testimony was unreliable on this basis. *Muniz*, 343 Mich at 444-445.

Defendant also argues that, to the extent Welke's testimony was based on her understanding of Child Sexual Abuse Accommodation Syndrome (CSAAS), it was unreliable and inadmissible because of a lack of scientific consensus concerning CSAAS's validity. But Welke did not testify regarding CSAAS specifically; rather, she provided general testimony regarding the range of behaviors child sexual assault victims may exhibit after an assault, particularly concerning delayed disclosure. "It has . . . long been recognized that the behavior of victims of varying kinds of trauma often appears irrational and confusing to most people; and expert testimony is admissible and appropriate to explain that behavior with no need to engage in an analysis of scientific reliability." *Muniz*, 343 Mich App at 445 (quotation marks and citation omitted). Welke's testimony "gave a general explanation of 'the common postincident behavior of children who are victims of sexual abuse.' " *Muniz*, 343 Mich App at 445, quoting *People v Peterson*, 450 Mich 349, 373; 537 NW2d 857 (1995). Defendant has failed to establish a basis for challenging Welke's testimony under *Daubert*.

Defendant has not established a reasonable likelihood that a request for a *Daubert* hearing would have altered the outcome of the proceedings against him. *Trakhtenberg*, 493 Mich at 51.

---

[7] Welke's testimony suggests that she may conduct some of her own research: "I participate in a quarterly research review where – now its done by Zoom where forensic interviewers get together and we discuss our recent research in the field."

Accordingly, his counsel was not ineffective for failing to advance a meritless position. *Ericksen*, 288 Mich App at 201.

Relatedly, defendant also argues that Welke's testimony was inadmissible because it vouched for the complainants' credibility. We disagree. An expert may not vouch for the credibility or truthfulness of a victim. *People v Dobrek*, 274 Mich 58, 71; 732 NW2d 546 (2007). An expert may not testify that a specific victim's allegations are truthful, and may not testify that a particular complainant's behavior is consistent with that of a sexually abused child. *Peterson*, 450 Mich at 374.

In this case, defendant argues that Welke's testimony regarding the behaviors of actual abuse victims "far too closely tracked the specifics of the complainant's allegations." Although defendant repeats this argument several times, he does not elaborate regarding which aspects of TK's and LM's allegations tracked Welke's testimony. The record shows that Welke testified very clearly that she had not viewed or read the transcript of the forensic interviews in this case, and had never met or spoken to the complainants or other witnesses in the case. Welke referred to TK and LM as "alleged victims." She made no reference to TK's and LM's specific allegations, the time, place, and manner of their disclosures, or any other aspect of the case, and made it clear that she was not testifying that the alleged abuse in this case actually happened. Rather, she testified generally regarding the wide range of postabuse behaviors children may exhibit. This testimony did not constitute vouching for TK's and LM's credibility. See *Muniz*, 343 Mich App at 447 ("That the general information about abuse victims' conduct about which [the expert] testified happened to be consistent with the complainant's postincident behavior does not constitute vouching.").

## D. TESTIMONY INDICATING THAT DEFENDANT WAS INCARCERATED

Defendant also argues that his counsel was ineffective for failing to object to testimony indicating that defendant was incarcerated. Specifically, defense counsel did not object to Myers's testimony that TK was scared because defendant had cut his tether off, and did not object to the introduction of jail phone call recordings during Haymon's testimony. We disagree that defense counsel was ineffective in this regard.

Regarding Myers's statement about the tether, it was an unprompted statement made in response to the prosecution's question about what the "whole experience" (presumably the disclosure, investigation, and trial) had been like for her family. As a matter of trial strategy, defense counsel may have opted not to draw attention to the statement with an objection. See *People v Unger*, 278 Mich App 210, 242, 253; 749 NW2d 272 (2008) (noting that an effective trial strategy may include a decision not to object to proffered evidence). We will not declare counsel ineffective merely because the strategy did not work. *Petri,* 279 Mich App at 412.

Regarding the jail phone call recording, the attorneys and the trial court discussed (outside of the presence of the jury) the consequences of calling Haymon to testify, including that she could be impeached with evidence that she violated the trial court's sequestration order by speaking to defendant on the phone. Defense counsel nonetheless presented Haymon's testimony. Haymon testified concerning when the family had moved to various homes, and also testified to the limitations defendant suffered after his childhood car accident. Defense counsel referred to the

jail calls in his closing argument, stating that he was "really glad" the jury got to hear defendant's voice and that "[t]hat is the voice of a man who sustained a traumatic brain injury." Defense counsel made further reference to the jail call by asking the jury, "Did you ever hear a recorded confession on a jail call?" It is clear from the record that defense counsel's decision to present Haymon's testimony, even though the jail call recording would be introduced into evidence, was one of trial strategy. Again, we will not assess this strategy with the benefit of hindsight, *Payne*, 285 Mich App at 190, or declare counsel ineffective merely because the strategy did not work, *Petri,* 279 Mich App at 412. Defendant has not demonstrated that his counsel's conduct fell outside the range of reasonable professional assistance. *Vaughn*, 491 Mich at 670.

## IV. SENTENCING

Defendant also argues that the trial court erred by imposing multiple consecutive sentences. We disagree. This Court reviews for an abuse of discretion a trial court's decision to impose statutorily-authorized consecutive sentences. *People v Norfleet*, 317 Mich App 649, 664-665; 897 NW2d 195 (2016).

In Michigan, concurrent sentencing is the norm. See *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012). Consequently, a trial court cannot impose consecutive sentences unless authorized by the Legislature. See *People v Chambers*, 430 Mich 217, 222; 421 NW2d 903 (1988). When the Legislature has authorized, but not mandated, consecutive sentencing, the trial court must articulate its rationale for its decision to impose consecutive sentencing; the rationale must be sufficiently particularized to permit appellate review. See *Norfleet*, 317 Mich App at 664-665.

Under MCL 750.520b(3), a trial court may order a term of imprisonment imposed for a CSC-I conviction "to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." Accordingly, consecutive sentencing was authorized, but not mandated, in defendant's case.

Defendant argues that the trial court failed to sufficiently articulate its rationale for imposing consecutive sentences. We disagree. At sentencing, defense counsel was able to argue extensively against consecutive sentencing, citing defendant's own history as an abuse victim and neurocognitive issues he suffered as a result of a childhood accident. In determining that consecutive sentencing was appropriate, the trial court stated in relevant part:

> There's the argument that sentencing you consecutively will be cruel and/or unusual punishment. I can tell you that what happened to those girls is cruel and unusual punishment, and they will suffer for the rest of their lives. You took away their first sexual experience. You took away how they feel about men. You took away about [sic] how they feel about the world, how they feel about themselves, how they see themselves.

> You gave them now a life of pain and constant healing, triggers, and trauma. Thankfully they have some mothers who are supportive, but ultimately they have to live in their skin and in their bodies, and they will always remember the way they were wrongfully touched.

* * *

In regard to, Counsel, your statement, the severity of the offense and how he has handled these little girls and the testimony that I heard and him taking no responsibility—I understand his constitutionally protected right, but the severity of the offenses on all of these counts speak for themselves and the multiple offenses.

I understand the prosecutor—well, technically I don't understand, but I understand it's common. I understand that not every single time he touched those girls or that was testified to there's [sic] a count. I think there were many, many counts that could have been. This could have been a 100-page felony information. It wasn't. That's not my choice. I have to deal with what I'm given.

I think a whole lot more went on than was charged. That's not my call. With the severity of what was actually in front of this Court and what the jury found him guilty [of] is so very serious. He essentially took the lives of these girls, changed them forever.

The sentence imposed for the same offense in this county—I've had multiple, multiple very similar cases, and this sentence is not unlike those.

It's also, as you yourself, Counsel, acknowledged, part of the legislative intent when there are such severe crimes and so many of them.

When we look at the *Snow* factors—punishment of Defendant, rehabilitation of Defendant, deterrence of others, and protection of society—I find that this sentence is proportional.

The punishment of Defendant is needed, but I don't think it will deter him. . . . It's also noted under evaluation and plan that when Defendant talked to probation he had a lack of remorse, empathy, and denial, and he did not accept any responsibility.

* * *

Given the series of events in this file, rehabilitation is unlikely and will be an uphill battle. His rehabilitation must be within the confines of the Michigan Department of Corrections. He is a young man—I recognize that—but I think the consecutive sentencing will take him to be a very old man and unlikely for him to be released. For the safety and mental health and well-being of his victims, I think that's important—and for the safety of the community and society as a whole.

Contrary to defendant's argument, we find the trial court's thorough recitation of its rationale behind the imposition of defendant's sentences to be sufficient to facilitate appellate review. Defendant argues that the trial court did not provide "any direct explanation for why several consecutive sentences were appropriate or why she chose to impose them." We disagree with defendant's characterization of the record. The trial court's articulation was more than sufficient to enable this Court to assess whether the trial court's decision to impose consecutive

-11-

sentences fell within the range of reasonable and principled outcomes. See *Norfleet*, 317 Mich App at 664.

Defendant also argues that the trial court violated his constitutional rights by finding that the offenses for which consecutive sentences were imposed arose out of a single transaction. Again, we disagree. Defendant did not raise this issue before the trial court, and we review it for plain error. *Jackson*, 292 Mich App at 597. In any event, this Court has held that "neither *Apprendi, Alleyne,* nor *Lockridge* compels the conclusion that consecutive sentencing in Michigan violates a defendant's Sixth Amendment protections," and that judge-found facts supporting the imposition of consecutive sentencing is constitutionally permissible. *People v DeLeon*, 317 Mich App 714, 722-726; 895 NW2d 577 (2016), citing *Oregon v Ice*, 555 US 160, 164; 129 S Ct 711; 172 L Ed 2d 517 (2009). *DeLeon* remains binding precedent on this Court. MCR 7.215(J)(1). Defendant has not established entitlement to relief on this issue.[8]

Defendant also argues that the trial court failed to explain why its chosen sentences were proportionate to the offense and the offender. But, as quoted above, the trial court engaged in a thorough explanation of the rationale behind its sentencing decisions, including an analysis of the four basic sentencing considerations found in *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972). To the extent that defendant argues that the trial court failed to satisfy its duty to articulate a rationale in support of its sentencing decisions, we disagree.

The actual thrust of defendant's argument appears to be that the trial court failed to consider mitigating factors about defendant and, accordingly, imposed an unreasonable sentence. A sentencing court must impose offenses that are proportionate to the offense and the offender. See *People v Boykin*, 510 Mich 171, 187; 987 NW2d 58 (2022). However, "a proportionality challenge to a given sentence must be based on the individual term imposed and not on the cumulative effect of multiple sentences." *Norfleet*, 317 Mich App at 734. "Therefore, although the combined term is not itself subject to a proportionality review, the decision to impose a consecutive sentence when not mandated by statute is reviewable for an abuse of discretion." *Id.* The question therefore becomes whether the trial court's imposition of consecutive sentences in this case was within the range of principled outcomes. *Id.* at 664.

We conclude that it was. The trial court noted the extreme effect that defendant's abuse had had upon his two victims, both of whom had engaged in self-harm, suicide attempts, and other self-destructive behaviors. The court also noted that numerous uncharged acts of sexual abuse likely occurred; this inference is more than supported by TK's testimony. The trial court explicitly stated that it had considered defendant's own history of abuse, mental health issues, and cognitive limitations, but also noted defendant's low chance of rehabilitation and lack of remorse or empathy. On this record, we cannot say that the trial court's decision fell outside the range of principled outcomes. *Norfleet*, 317 Mich App at 734. Although defendant may have had some cognitive limitations as a result of a childhood accident, the record shows that he was found

---

[8] We note that defendant does not challenge the determination that several of defendant's offenses did arise from the same transaction; defendant merely argues that this fact was required to be found by a jury, not the sentencing judge.

competent to stand trial, and witness testimony indicated that defendant could generally live as an adult in society. Defendant was able to read, speak, drive (although he did not have a license), cook basic foods, and even date and father children of his own. The trial court did not abuse its discretion by imposing consecutive sentences.

Affirmed.[9]

/s/ Christopher P. Yates
/s/ Mark T. Boonstra
/s/ Adrienne N. Young

---

[9] Defendant also argues that the trial court erred by denying him a *Ginther* hearing regarding his counsel's alleged ineffectiveness. Because defendant did not assert any errors that would require further factual development of the record in order to review them, any error in the trial court's denial of an evidentiary hearing was harmless. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).